**BOWEN HALL**
Dan C. Bowen, Esq.
dbowen@bowenhall.com
Nevada Bar No. 1555
555 South Center Street
Reno, Nevada 89501
Tel: (775) 323-8678
Fax: (775) 786-6631

**SAXENA WHITE P.A.**
Joseph E. White, III
jwhite@saxenawhite.com
Lester R. Hooker
lhooker@saxenawhite.com
2424 N. Federal Hwy., Ste. 257
Boca Raton, FL 33431
Tel: (561) 394-3399
Fax: (561) 394-3382

*ATTORNEYS FOR PLAINTIFF*

[Additional counsel appears on signature page.]

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| WILLIAM P. SKENE, Individually and On Behalf of All Others Similarly Situated, | **Civil Action No.** |
| Plaintiff, | **CLASS ACTION** |
| vs. | |
| SPECTRUM PHARMACEUTICALS, INC., RAJESH C. SHROTRIYA, BRETT L. SCOTT and JOSEPH KENNETH KELLER, | **CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** |
| Defendants. | **JURY TRIAL DEMANDED** |

Plaintiff William P. Skene, individually and on behalf of all others similarly situated, alleges the following against Spectrum Pharmaceuticals, Inc. ("Spectrum" or the "Company"), Rajesh C. Shrotriya ("Shrotriya"), Brett L. Scott ("Scott") and Joseph Kenneth Keller ("Keller"). Plaintiff makes these allegations upon personal knowledge as to those allegations concerning Plaintiff and, as to all other matters, upon the investigation of counsel, which included, without limitation: (a) review and analysis of public filings made by Spectrum with the Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and other publications disseminated by Defendants; (c) review of news articles, shareholder communications, conference call transcripts, and postings on Spectrum's website concerning the Company's public statements; and (d) review of other publicly available information concerning Spectrum and the Individual Defendants (as defined below).

I.    **NATURE OF THE ACTION**

1.    This is a federal securities class action against Spectrum and certain of its officers and/or directors for violations of the federal securities laws. Plaintiff brings this action on behalf of all persons or entities who purchased or otherwise acquired shares of Spectrum securities between August 8, 2012 and March 12, 2013, inclusive (the "Class Period"), seeking to pursue remedies under §§10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"). The Exchange Act claims allege that Defendants engaged in a fraudulent scheme to artificially inflate the Company's stock price. As a result of the fraud described below, the Company has lost a substantial portion of its value.

2.    Defendant Spectrum is headquartered in Henderson, Nevada and is a biotechnology company with fully integrated commercial and drug development operations. The Company acquires, develops and commercializes a broad and diverse pipeline of late-stage clinical and commercial products, primarily in the areas of hematology and oncology. Spectrum markets two oncology drugs, ZEVALIN and FUSILEV (levoleucovorin).

3.     On March 12, 2013, Spectrum issued a press release acknowledging that sales of FUSILEV, the Company's top revenue generator, would decline significantly due to the "recent stabilization of the folate analog market." As a result, the Company's revenue guidance in the range of $160 to $180 million would be significantly lower than analysts' revenue expectations of $300 million. On this news, Spectrum's stock plummeted more than 37%, closing at $7.79 on March 13, 2013.

4.     During the Class Period, Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts concerning Spectrum's business, operations and prospects. Specifically, Defendants made false and misleading statements and failed to disclose that: (a) Spectrum's sales of FUSILEV would drastically decline once increased supplies of the generic folate analog, leucovorin, were made available; (b) the purported advantages of FUSILEV over generic leucovorin were negligible and would not be sufficient to convince clinics and hospitals to continue to use the more expensive FUSILEV once the leucovorin shortage was eliminated; and (c) based upon the above, the defendants lacked a reasonable basis for their positive statements about the Company and its revenue earnings during the class period.

5.     As a result of Defendants' wrongful acts, false and misleading statements and omissions, have caused a precipitous decline in the market value of the Company's securities. Plaintiff and other Class members have suffered significant losses and damages.

## II.     JURISDICTION AND VENUE

6.     This action arises under Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§ 78j(b) and 78t(a)], and Rule 10b-5 promulgated thereunder [17 C.F.R. § 240.10b 5].

7.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

8.     Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act and 28 U.S.C. §1391(b). Spectrum is headquartered and maintains offices in this District. Many of the acts and conduct complained of herein, including the preparation and dissemination

of materially false and misleading information to the investing public, occurred in substantial part in this District.

9.     In connection with the acts and omissions alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## III.   **THE PARTIES**

10.    Plaintiff William P. Skene, as set forth in the accompanying certification and incorporated by reference herein, purchased the publicly traded Spectrum securities at artificially inflated prices during the Class Period and have been damaged thereby.

11.    Defendant Spectrum is a commercial-stage biotechnology company with fully integrated commercial and drug development operations, with a focus in oncology and hematology.   The Company's primary strategy is comprised of acquiring, developing and commercializing a broad and diverse pipeline of late-stage clinical and commercial products.

12.    Defendant Rajesh C. Shrotriya ("Shrotriya") has served as the President, Chief Executive Officer and Chairman of the Board at Spectrum since August 2002.   Shrotriya also serves as Chairman of the Placement Committee and Product Acquisition Committee.

13.    Defendant Brett L. Scott ("Scott") has served as Acting Chief Financial Officer and Senior Vice President at Spectrum since October 2010.   Scott has also served as the Company's Principal Accounting Officer since November 2010.

14.    Defendant Joseph Kenneth Keller ("Keller") has served as Senior Vice President and Chief Financial Officer of Spectrum since August 2012.

15.    Defendants Shrotriya, Scott and Keller are collectively referred to herein as the "Individual Defendants."

16.    During the Class Period, the Individual Defendants, as senior executive officers and/or directors of Spectrum, were privy to confidential, proprietary and material adverse non-

public information concerning Spectrum, its operations, finances, financial condition and present and future business prospects via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or board of directors meetings and committees thereof, and via reports and other information provided to them in connection therewith.  Because of their possession of such information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

17.     The Individual Defendants are liable as direct participants in the wrongs complained of herein.  In addition, the Individual Defendants, by reason of their status as senior executive officers and/or directors, were "controlling persons" within the meaning of §20(a) of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein.  Because of their positions of control, the Individual Defendants were able to and did, directly or indirectly, control the conduct of Spectrum's business.

18.     The Individual Defendants, because of their positions with the Company, controlled and/or possessed the authority to control the contents of its reports, press releases and presentations to securities analysts and through them, to the investing public.  The Individual Defendants were provided with copies of the Company's reports and publicly disseminated documents alleged herein to be misleading, prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Thus, the Individual Defendants had the opportunity to commit the fraudulent acts alleged herein.

19.     As senior executive officers and/or directors and as controlling persons of a publicly traded company whose securities were, and are, registered with the SEC pursuant to the Exchange Act, and were traded on the NASDAQ and governed by the federal securities laws, the Individual Defendants had a duty to disseminate promptly accurate and truthful information with respect to Spectrum's financial condition and performance, growth, operations, financial

4

statements, business, products, markets, management, earnings, and present and future business prospects, to correct any previously issued statements that had become materially misleading or untrue, so the market price of Spectrum's securities would be based on truthful and accurate information.   The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

20.   The Individual Defendants are liable as participants in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Spectrum's publicly traded securities by disseminating materially false and misleading statements and/or concealing material adverse facts.

## IV.   SUBSTANTIVE ALLEGATIONS

### A.   Background of Spectrum

21.   Spectrum is a commercial-stage biotechnology company with fully integrated commercial and drug development operations, with a focus in oncology and hematology.   The Company primarily markets two oncology drugs, FUSILEV and ZEVALIN.   FUSILEV is used in combination with a chemotherapy drug called 5-fluorouracil (5-FU) for the palliative treatment of advanced metastatic colorectal cancer.   ZEVALIN, a radiotherapeutic monoclonal antibody, is indicated for the treatment of non-Hodgkin's lymphoma.

22.   FUSILEV (levoleucovorin injection) is used as an antidote to the harmful effects of methotrexate (a cancer medicine) that is given in high doses in patients with bone cancer (osteosarcoma). It is also used to treat over dosage of certain medicines.   FUSILEV acts the same way in the body as folic acid (vitamin B9).   Levoleucovorin injection is also used in combination with 5-fluorouracil to relieve and prevent symptoms of patients with advanced metastatic cancer of the colon and rectum.

23.   FUSILEV's primary competitor is the generic version of the drug, leucovorin. Generic leucovorin is a 50/50 mixture of D- and L-folinic acid, a prodrug for tetrahydrofolic acid, which is a cofactor used for the synthesis of amino acids and nucleic acids.   Methotrexate

inhibits the enzyme responsible for making tetrahydrofolic acid, the consequence of which is death of rapidly proliferating cells, like cancer cells. A problem arises when other rapidly proliferating cells in the body, like marrow cells and some portions of the gut, are also affected by methotrexate. Leucovorin is a "rescue therapy" which gives healthy, non-cancerous cells the cofactor they need to continue biological processes. Leucovorin is also prescribed as rescue therapy with 5-fluorouracil, another chemotherapeutic that disrupts nucleic acid synthesis.

24. The science behind levoleucovorin is straightforward. Generic leucovorin is a racemic mixture of dextro- and levoleucovorin. The compound mixture sold as leucovorin is called a racemate because it contains equal parts of mirror images (designated D and L) of the desired compound, also called enantiomers. Leucovorin's L- isomer is the active form while the D- form is merely inactive. Though dextroleucovorin has no biological activity, as a practical matter, it is cheaper to make a racemic mixture than to isolate out the stereoisimer. Spectrum's FUSILEV is merely the active L- isomer of leucovorin, deemed levoleucovorin.

25. Commenting on FUSILEV, Leonard Staltz, a colorectal cancer expert at Memorial Sloan-Kettering Cancer Center stated:

> It's not even clear to me why somebody decided to make levoleucovorin, but they did, and they experimented to see if it was better, and, gosh-golly-gee-wiz, it's not. Just that basically 50 mg of levo equals 100 mg of racemic, because 100 mg of racemic has 50 mg of levo in it.

26. In August 2008, the American Hospital Formulary Service published a study comparing the clinical benefits, safety and efficacy of FUSILEV (levoleucovorin) to generic leucovorin and concluded:

> "Given the lack of established difference in either the safety or efficacy profile of the levoleucovorin-fluorouracil regimens relative to the racemic leucovorin-fluorouracil regimens, as well as the lack of consistent pharmacokinetic data demonstrating an adverse effect of the racemic leucovorin formulation on the pharmacokinetics and biologic effects of the L-isomer, the clinical benefit of using levoleucovorin in combination with fluorouracil for the treatment of advanced-stage colorectal cancer is not fully established."

27.     In 2009, researchers at Georgetown reviewed all the published studies of the use of levoleucovorin in gastrointestinal malignancies to assess whether levoleucovorin is a reasonable alternative to racemic leucovorin. The report entitled, "Is Levoleucovorin an Alternative to Racemic Leucovorin? A Literature Review" concluded:

> "In many studies of patients with gastrointestinal malignancies, levoleucovorin has been used interchangeably and solely for racemic leucovorin for 5-FU modulation. Our literature review demonstrates that levoleucovorin has similar efficacy and tolerability when compared with racemic leucovorin, whether used in combination with other chemotherapeutic agents or alone."

28.     Leucovorin is manufactured primarily by Teva Pharmaceuticals USA ("Teva") and Bedford Laboratories ("Bedford"). In late 2008, Teva warned that its stockpiles were low due to increased demand and informed the Food and Drug Administration ("FDA") that it was working at full capacity to fill orders. Around the same time, Bedford announced that due to the expansion of its manufacturing facilities, production of leucovorin would be delayed. The manufacturing issues combined with increasing demand for leucovorin led to a shortage of the drug prompting the FDA to issue an alert in November 2008 that supplies were low nationwide.

29.     The shortage of leucovorin presented the perfect opportunity for Spectrum to enter the market with the more expensive, branded drug, levoleucovorin, sold under the trade name FUSILEV. Paul Arndt, manager of investor relations at Spectrum, commented on the potential for increased sales of FUSILEV stating, "We've definitely seen some benefit from the leucovorin shortage."

30.     During the shortage, healthcare payers begrudgingly relied on the use of FUSILEV (levoleucovorin) for rescue therapy for cancers in replace of leucovorin. Making just the L- isomer of leucovorin brings with it a price tag nearly 60 times that of racemic leucovorin, an obvious reason for why healthcare payers and insurers were hesitant to pay a significant premium for a drug with no clinical benefit compared to cheaper, generic alternatives. As a case in point, in response to requests to cover levoleucovorin from oncologists, Lee Newcomer, business leader of Oncology Services for United Healthcare of Minneapolis stated, ***"we will***

1  *cover it on a temporary basis until the shortage is resolved. What we won't do is cover levo as*

2  *a long term substitute. As soon as this shortage is over, this drug is going to lose coverage,*

3  *because there is no reason for it."*

4      31.     During the Class Period, Defendants made false and misleading statements and

5  failed to disclose that: (a) Spectrum's sales of FUSILEV would drastically decline once the

6  generic folate analog, leucovorin, was again made available; (b) the purported advantages of

7  FUSILEV over generic leucovorin were negligible and were insufficient to convince clinics and

8  hospitals to continue to use the more expensive FUSILEV once the leucovorin shortage was

9  eliminated; and (c) based upon the above, the defendants lacked a reasonable basis for their

10  positive statements about the Company and its revenue earnings during the class period.

11      **B.   Defendants' False and Misleading Statements**

12      32.     In regular press releases, conference calls and filings with the SEC, Spectrum and

13  the Individual Defendants repeatedly made false and misleading statements and omissions

14  concerning the Company's: (i) sales prospects for FUSILEV and (ii) concealed the potential

15  negative impact on sales of FUSILEV presented by the increased availability of the generic drug,

16  Leucovorin.  These false and misleading statements downplayed the potential impact of generic

17  alternatives while artificially inflating the Company's stock price.

18      33.     The Class Period commences on August 8, 2012.  On that date, the Company

19  issued a press release reporting earnings for the second quarter of 2012.  The press release stated

20  in pertinent part:

21      Financial Highlights

22      $278.5 Million in Cash, Investments and Receivables as of June 30, 2012 --
23              After Cash Payment of $25.4 Million for Ex-US ZEVALIN Rights -- As
             Compared with $253 Million in March 31, 2012.

24      •   Three- and Six-Month Total Revenues of $68.7 Million and $128.6 Million,
25          Respectively, Compared to $45.4 Million and $89.0 Million in the Same
         Periods Last Year.

26

27

28

- Non-GAAP EPS of $0.37 per Diluted Share Compared to $0.25 Per Diluted Share in the Second Quarter Last Year. GAAP EPS of $0.29 per Diluted Share Compared to $0.12 Per Diluted Share in the Second Quarter Last Year.

- Record FUSILEV Revenues of $56.6 Million Compared to $33.9 Million in the Second Quarter Last Year. *Current Trends Indicate Strong Demand Should Continue.*

"The second quarter was a historic period for Spectrum, during which we had record revenues and strong profits," said Rajesh C. Shrotriya, MD, Chairman, Chief Executive Officer, and President of Spectrum Pharmaceuticals. "These are exciting times at Spectrum, and we expect several key catalysts before the end of the year. Based on our current product portfolio, strong financial position, robust pipeline and active business development, we are in a formidable position to further grow our company over the next 5 years."

34.     In connection with the announcement of the Company's second quarter 2012 financial results, on August 8, 2012, Spectrum hosted a conference call to discuss the Company's financial results that was open to, among others, financial analysts, investors and other market participants. Defendant Shrotriya was present and, in relevant part, stated:

[ANALYST:]  Raj, I think one of the other questions linked to FUSILEV, just to pick up where Joe Pantginis left off, is that there's a common perception that once the generic leucovorin shortage is alleviated, that basically, you guys are toast. And so what I'd like to hear from you is, number one, what's your understanding about the recent developments in the -- sort of the leucovorin shortage. And number two, assuming that at some point in the future, the generic leucovorin does make it back to the marketplace, how does Spectrum continue to obtain further share against generic equivalent?

[DEFENDANT SHROTRIYA:]  Mike, that's a very good question. So I think first thing that you say that -- it's a pity that, that question keeps coming up for last 7 or 8 quarters. I heard that the day in fact they got approval on April 28, last year, when we got approval, somebody put out a blog and saying that this drug is going to be – Spectrum is going to go down the hill, and we lost the huge market cap on that day, on a day when we got approval for FUSILEV. Quarter after quarter, around the -- our earnings release, there are some blogs appear and that misinformation appears. And there is absolutely no basis. That information appears we try to manipulate our stock or some malicious intent. In fact, numbers speak for themselves. I think people have to understand that FUSILEV is not leucovorin generic, which is a mixture of -- racemic mixture of 50% biologically dextrorphan [ph] and 50% levorphan [ph]. Dextro [ph] has been around for 60 years. In Europe, there is no shortage of generic leucovorin. And still the sales of FUSILEV, or levoleucovorin, in Europe and Japan x U.S. are close to $150 million to $ 200 million a year. *And this drug has been available for over 15 years x U.S. So we believe not only the fact that FUSILEV got approval in 2011, as compared to generic leucovorin approval of 1952, the fact that FUSILEV has a unique J-code should clearly tell people, who are educated enough to understand the marketing and selling oncology drug, that it's a*

*differentiated product and it has nothing to do with generic leucovorin*. That's number one. Number two, generic companies come in and out of market. *The shortage of generic leucovorin, why is it shortage generic leucovorin? There are many companies that make it. They will compete with each other.* There are companies in -- that get approval. More drugs -- more companies will get generic approval. In fact, as generic leucovorin supply is increasing in the marketplace -- so in other words, the shortage is abating. FUSILEV sales continue to grow. *So the penetration and traction of FUSILEV is sustainable, and I believe that generic companies will compete with themselves, not with FUSILEV.*

35.    On August 10, 2012, the Company issued a press release announcing a Stock Repurchase Program of up to $100 million of the Company's common stock.  The press release provided in pertinent part:

Spectrum Pharmaceuticals (NasdaqGS: SPPI), a biotechnology company with fully integrated commercial and drug development operations with a primary focus in hematology and oncology, today announced that the Company's Board of Directors has approved an increase in its stock repurchase program authorizing the repurchase of up to a total of $100 million of the Company's common stock. The Company was previously authorized to repurchase up to $25 million of its stock.

*"Spectrum's Board of Directors and senior management have confidence in our Company's prospects and believe repurchases of Spectrum stock represent an attractive opportunity to enhance long-term shareholder value,"* stated Rajesh C. Shrotriya, M.D., Chairman, President and Chief Executive Officer of Spectrum Pharmaceuticals, Inc. "This program gives us the opportunity to invest in our stock as we need to. We believe that the current share price represents a significant discount to the intrinsic value of the Company. We will be starting to purchase stock today."

36.    Immediately following the announcement of the Stock Repurchase Program, Defendant Shrotriya sold $2.6 million worth of Spectrum stock in mid August 2012.

37.    On November 7, 2012, Spectrum issued a press release reporting on earnings for the third quarter of 2012.  The press release stated in pertinent part the following:

Strong FUSILEV® (levoleucovorin) for Injection revenues recorded in Q3. Accounts ordering FUSILEV increased by 13% over last quarter. FUSILEV market penetration at approximately 31% up from 29% in the prior quarter.

Company expects Pro-Forma Revenue to exceed $300 million in 2012, up from earlier guidance of around $300 million.

"The third quarter marks the eighth consecutive profitable quarter that has helped Spectrum establish a great foundation and platform to attain additional growth," said Rajesh C. Shrotriya, M.D., Chairman, President and Chief Executive Officer

of Spectrum Pharmaceuticals, Inc. "Diversification is key to our strategy, and we took a major step in that direction by completing the acquisition of Allos in September and adding a third product, FOLOTYN, to our portfolio. Four years ago we were primarily a FUSILEV company with limited cash. Today, Spectrum has FUSILEV, worldwide ZEVALIN, and FOLOTYN, along with a robust, maturing pipeline, and a strong balance sheet."

38.     On November 7, 2012, Spectrum hosted a conference call to discuss the Company's financial results that was open to, among others, financial analysts, investors, and other market participants. Defendant Keller and Shrotriya were present and, in relevant part, stated:

> [DEFENDANT KELLER:] The second area I want to cover today is the progress we made in building and refitting our commercial organization to accelerate the growth of our 3 marketed oncology drugs. We are starting this process from a solid foundation. Because of changes in buying patterns, there can be some fluctuation in FUSILEV sales as we saw this quarter. ***Importantly, FUSILEV demand remains strong despite readily available supplies of generic leucovorin. Market research shows that 75% of physicians say that generic leucovorin is available without difficulty. It is clear that physicians are continuing to choose FUSILEV even when other options are available.***

* * *

> [ANALYST:]  While you continue to grow the FUSILEV franchise, I just wanted to see if you can add some additional color regarding -- especially when you're doing all of these different surveys, what competitive pressures you are seeing and specifically might anticipate, especially from the newly approved drug from SAGENT.

> [DEFENDANT SHROTRIYA:]  So the only competition that I'm aware of that all generic companies are trying to increase their production, they have increased their production. Teva has imported drug and has been calling our customers -- calling their clients and customers that they have got -- they're loaded with generic leucovorin that they have imported. And now SAGENT has been approved. And last year, we know that APB was approved. In addition to that, there are other companies, several companies. ***And typically, generic companies compete with themselves. In fact, I'm looking for a day when market is over-flooded with all generic leucovorin supplies and they fight with each other and kill each other and Spectrum's FUSILEV will keep performing on its growth trajectory that it has been doing in the past. And all the industry players, all the people who believe that somehow FUSILEV sales are going to go fall off the cliff, we have proven them wrong for 8 quarters, and I must -- you must take my word for it, we'll prove them forever. FUSILEV was approved by the FDA in April 2011. It's a pure isomer that benefits. Doctors will see no need to use a cheaper product.***

39.     On February 21, 2013, Spectrum issued a press release reporting on earnings for the fourth quarter and fiscal year 2012 financial results.  The press release stated in pertinent part the following:

Total GAAP revenue for 2012 was $267.7 million; pro forma revenue (including ex-US ZEVALIN® and FOLOTYN® for the entire year) was $302 million.

GAAP Product revenues were up 41% and net income increased by 95% in 2012.

The Company reported GAAP Diluted EPS of $1.46 and Non-GAAP Diluted EPS of $1.42 compared to last year GAAP EPS of $0.84 and non-GAAP of $1.31.

"With substantial year-over-year sales growth, 2012 stands out as a transformational year for Spectrum and provides a solid platform for anticipated strong growth in sales and operating income in 2013," stated Rajesh C. Shrotriya, M.D., Chairman, President and Chief Executive Officer of Spectrum Pharmaceuticals, Inc. "FUSILEV® sales volume was up in the fourth quarter in a competitive environment. We also diversified our commercial portfolio through the addition of FOLOTYN® last fall, and FOLOTYN demonstrated robust sales in the most recent quarter. As we enhanced our global footprint and increased our commercial and market penetration, we also expanded our senior commercial team and implemented a new structure to allow our sales force to be even more customer-facing."

40.     On February 21, 2013, Spectrum hosted a conference call to discuss the Company's fourth quarter and fiscal year 2012 financial results that was open to, among others, financial analysts, investors, and other market participants. Defendant Keller and Shrotriya were present and, in relevant part, stated:

[DEFENDANT SHROTRIYA:] We are very excited about the outlook for the company. Last year, FUSILEV grew 56% in unit volume, and 33% in dollar sales. *FUSILEV demand remains strong, and we continue to see opportunities to expand its use.*

* * *

[DEFENDANT KELLER:]  In the second half of 2012, our FUSILEV business shifted more towards accounts qualified for government pricing especially 340b purchasing. While in 2012, FUSILEV unit sales increased approximately 56% over 2011. Government rebates inclusive of 340b chargebacks increased approximately tenfold from $3.8 million in 2011 to $47.3 million in 2012.

Our market research shows that this shift is largely complete, and going forward, we expect stable demand in this segment. Currently, approximately 75% of total FUSILEV business resides in the clinic segment. This creates a very strong base

of FUSILEV business on which we can build upon and focus our commercial efforts against.

To reinforce this, I'm pleased to share with you that the number of clinics purchasing FUSILEV continues to grow and end-user demand year-to-date in 2013 is higher than in December of 2012. We expect this trend to continue throughout 2013.

* * *

[ANALYST:] I'll start with 2 questions. First, either Raj or Ken. Ken, can you shed some light on what is meant by the company's being stable or a high clinical demand this quarter versus the next, does it mean that sales could be stable or do you still expect adjustments and gross to net going into this quarter? And then the second question for me would be can you give some more details about what's assumed in guidance for 2013?

[DEFENDANT KELLER:] Sure. Thanks for the question. ***So when we look at FUSILEV business right now, what we see is end-user demand, customer-generated demand is very, very stable right now. In fact, when you look at the first few weeks of this year, and we have data all the way through January, the demand is actually higher than it was in December. So we feel that the underlying demand is very stable. Now purchasing patterns do change, but the underlying demand is very, very, very solid.*** The second point I think that will help to clarify is today, 75% of FUSILEV business is in the clinic setting. That setting is very, very sticky for FUSILEV. Once accounts are using this product, it's very rarely do they go back to generic racemic leucovorin. So that gives us a nice place to build upon and really use our new commercial organization to drive and grow the business in that segment from where we are right now.

[DEFENDANT SHROTRIYA:] So Adnan, to add to what Ken said, I think you also asked about 2013. ***We expect with the trends we are seeing in January, and we are seeing the new accounts and the reorders from the old accounts, that we expect that 2013 revenues to continue to grow. And we expect our sales to be higher than we had in 2012.***

C.   **The Truth Comes to Light**

41.   On March 12, 2013, Spectrum issued a press release commenting on the Company's anticipated first quarter performance and updating its 2013 financial outlook. The Company acknowledged that sales of FUSILEV, the Company's top revenue generator, would decline significantly due to the "recent stabilization of the folate analog market." As a result, the Company's revenue guidance in the range of $160 to $180 million for the full year 2013 would

be significantly lower than analysts' revenue expectations of $300 million.  The press release stated in pertinent part:

> Based upon recent communications with customers, Spectrum Pharmaceuticals anticipates a change in ordering patterns of FUSILEV® following the recent stabilization of the folate analog market. The Company now expects that FUSILEV sales will be approximately $10 to $15 million for the first quarter of the year, and approximately $80 to $90 million for the 2013 fiscal year. The Company noted that, while hospital sales are shifting to generics, the end-user demand for FUSILEV remains stable in the clinics, and the Company continues to anticipate solid demand in this segment in 2013. The Company believes the majority of the impact from the change in ordering patterns will be reflected in the first half of 2013 and expects to return to a run-rate that more closely aligns with end-user demand by the end of the year.

42.     On this news, Spectrum's common stock plummeted from close of $12.43 per share on March 12, 2013 to $7.79 per share on March 13, 2013, a decline of more than *37%* on unusually heavy trading volume.

43.     Spectrum's statements and filings during the Class Period were materially false and misleading because they failed to disclose and misrepresented that: (a) Spectrum's sales of FUSILEV would drastically decline once increased supplies of the generic folate analog, leucovorin,  were made available; (b) the purported advantages of FUSILEV over generic leucovorin were negligible and were insufficient to convince clinics and hospitals to continue to use the more expensive FUSILEV once the leucovorin shortage was eliminated; and (c) based upon the above, the defendants lacked a reasonable basis for their positive statements about the Company and its revenue and earnings during the Class Period.

**V.      <u>NO SAFE HARBOR</u>**

44.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

45.     Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Spectrum who knew that those statements were false when made.

## VI.     UNDISCLOSED ADVERSE INFORMATION

46.     The market for Spectrum's securities was an open, well-developed and efficient market at all relevant times.  As a result of the materially false and misleading statements and failures to disclose described herein, Spectrum securities traded at artificially inflated prices during the Class Period.

47.     Plaintiff and the other members of the Class purchased or otherwise acquired Spectrum securities relying upon the integrity of the market price of Spectrum' securities and market information related to Spectrum, and have been damaged thereby.

48.     During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Spectrum's securities, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and misleading.  Such statements and omissions were materially false and misleading in that they concealed the impact that the increased availability of competing generic drug (leucovorin) would have on sales of FUSILEV.

49.     At all relevant times, the material misrepresentations and omissions particularized herein directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and the other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and misleading statements about Spectrum's business, prospects and operations.

50.     These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of Spectrum and its business, prospects and operations, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times.  Defendants' false and misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein.

VII.    **SCIENTER ALLEGATIONS**

51.     As alleged herein, the Individual Defendants acted with scienter in that the Individual Defendants knew that the public documents and statements issued or disseminated in the name of the Company during the Class Period were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

52.     As set forth herein, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Spectrum, their control over, receipt and/or modification of Spectrum allegedly materially misleading statements and omissions, and positions with the Company which made them privy to confidential information concerning Spectrum, participated in the fraudulent scheme alleged herein.

53.     The ongoing fraudulent scheme described herein could not have been perpetrated over a substantial period of time, as has occurred, without the knowledge and complicity of the personnel at the highest level of the Company, including the Individual Defendants.

VIII.   **LOSS CAUSATION**

54.     During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the prices of Spectrum's securities and operated as a fraud or deceit on Class Period purchasers of Spectrum's securities by failing to disclose to investors that the Company's financial results were materially

1 misleading and misrepresented material information.  When Defendants' misrepresentations and

2 fraudulent conduct were disclosed and became apparent to the market, the prices of Spectrum's

3 securities fell as the prior inflation came out of the Company's stock price.  As a result of their

4 purchases of Spectrum securities during the Class Period, Plaintiff and the other Class members

5 suffered economic loss, *i.e.*, damagers, under the federal securities law.

6       55.    By failing to disclose the true state of the Company's business prospects and

7 growth strategy, investors were not aware of the true state of the Company's financial status.

8 Therefore, Defendants presented a misleading picture of Spectrum's business and prospects.

9 Thus, instead of truthfully disclosing during the Class Period the true state of the Company's

10 business, Defendants caused Spectrum to conceal the truth.

11       56.    The decline in the price of Spectrum common stock after the truth came to light

12 was a direct result of the nature and extent of Defendants' fraud finally being revealed to

13 investors and the market.  The timing and magnitude of Spectrum's common stock price decline

14 negates any inference that the loss suffered by Plaintiff and the other Class members was caused

15 by changed market conditions, macroeconomic or industry factors or Company-specific facts

16 unrelated to the Defendants' fraudulent conduct.  The economic loss suffered by Plaintiff and the

17 other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate

18 the prices of Spectrum's securities and the subsequent decline in the value of Spectrum's

19 securities when Defendants' prior misrepresentations and other fraudulent conduct were

20 revealed.

21 **IX.**    **APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE**

22     **MARKET DOCTRINE**

23       57.    At all relevant times, the market for Spectrum stock was an efficient market for

24 the following reasons, among others:

25             a.    Spectrum securities met the requirements for listing, and were listed and

26                  actively traded on the NASDAQ, a highly efficient market;

27

28

b.   As a regulated issuer, Spectrum filed periodic public reports with the SEC and the NASDAQ;

c.   Spectrum securities were followed by securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace; and

d.   Spectrum regularly issued press releases which were carried by national newswires. Each of these releases was publicly available and entered the public marketplace.

58.   As a result, the market for Spectrum securities promptly digested current information with respect to the Company from all publicly-available sources and reflected such information in Spectrum' stock price. Under these circumstances, all purchasers of Spectrum securities during the Class Period suffered similar injury through their purchase of stock at artificially inflated prices and a presumption of reliance applies.

## X.   CLASS ACTION ALLEGATIONS

59.   Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of all persons who purchased or otherwise acquired Spectrum securities during the Class Period and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of Spectrum and members of their immediate families, any subsidiary or affiliate of Spectrum, employees of the Company or its subsidiaries or affiliates, or any entity in which any excluded person has a controlling interest, and the legal representatives, heirs, successors and assigns of any excluded person.

60.   The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are

thousands of members of the Class located throughout the United States.  Throughout the Class Period, Spectrum securities were actively traded on the NASDAQ, an open and efficient market, under the ticker symbol "SPPI".  As of March 19, 2013, the Company had approximately 60 million shares of common stock outstanding.  Record owners and other members of the Class may be identified from records maintained by Spectrum and/or its transfer agents and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

61.     Plaintiff's claims are typical of the claims of the other members of the Class as all members of the Class were similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

62.     Plaintiff will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

63.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

a.     whether the federal securities laws were violated by Defendants' acts and omissions as alleged herein;

b.     whether Defendants participated in and pursued the common course of conduct complained of herein;

c.     whether documents, press releases, and other statements disseminated to the investing public and the Company's shareholders during the Class Period misrepresented material facts about the business, finances, financial condition and prospects of Spectrum;

d.     whether statements made by Defendants to the investing public during the Class Period misrepresented and/or omitted to disclose material facts about the business, finances, value, performance and prospects of Spectrum;

19

e.     whether the market price of Spectrum common stock during the Class Period was artificially inflated due to the material misrepresentations and failures to correct the material misrepresentations complained of herein; and

f.     the extent to which the members of the Class have sustained damages and the proper measure of damages.

64.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this suit as a class action.

## XI.     COUNTS UNDER THE EXCHANGE ACT

### COUNT I
**For Violations Of §10(b) Of The Exchange Act And Rule 10b-5 Promulgated Thereunder Against All Defendants**

65.     Plaintiff repeats and realleges the allegations set forth above as though fully set forth herein.

66.     During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Spectrum common stock; and (iii) cause Plaintiff and other members of the Class to purchase Spectrum stock at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, the Defendants took the actions set forth herein.

67.     These Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices and a course of business which

operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Spectrum securities in violation of §10(b) of the Exchange Act and Rule 10b-5. Defendants are sued as primary participants in the wrongful and illegal conduct charged herein. Individual Defendants are also sued herein as controlling persons of Spectrum, as alleged herein.

68.     In addition to the duties of full disclosure imposed on Defendants as a result of their making of affirmative statements and reports, or participation in the making of affirmative statements and reports to the investing public, defendants had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC as embodied in SEC Regulation S X (17 C.F.R. § 210.01 et seq.) and S-K (17 C.F.R. § 229.10 et seq.) and other SEC regulations, including accurate and truthful information with respect to the Company's operations, financial condition and performance so that the market prices of the Company's publicly traded securities would be based on truthful, complete and accurate information.

69.     Spectrum and the Individual Defendants, individually and in concert, directly and indirectly, by the use of means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, business practices, performance, operations and future prospects of Spectrum as specified herein. These Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Spectrum's value and performance and substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Spectrum's and its business, operations and future prospects, in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a

1   course of business which operated as a fraud and deceit upon the purchasers of Spectrum's

2   securities during the Class Period.

3          70.   Each of the Individual Defendants' primary liability, and controlling person

4   liability, arises from the following facts: (i) each of the Individual Defendants was a high-level

5   executive and/or director at the Company during the Class Period; (ii) each of the Individual

6   Defendants, by virtue of his responsibilities and activities as a senior executive officer and/or

7   director of the Company, was privy to and participated in the creation, development and

8   reporting of the Company's operational and financial projections and/or reports; (iii) the

9   Individual Defendants enjoyed significant personal contact and familiarity with each other and

10   were advised of and had access to other members of the Company's management team, internal

11   reports, and other data and information about the Company's financial condition and

12   performance at all relevant times; and (iv) the Individual Defendants were aware of the

13   Company's dissemination of information to the investing public which they knew or recklessly

14   disregarded was materially false and misleading.

15          71.   These Defendants had actual knowledge of the misrepresentations and omissions

16   of material facts set forth herein, or acted with reckless disregard for the truth in that they failed

17   to ascertain and to disclose such facts, even though such facts were readily available to them.

18   Such Defendants' material misrepresentations and/or omissions were done knowingly or

19   recklessly and for the purpose and effect of concealing Spectrum's operating condition, business

20   practices and future business prospects from the investing public and supporting the artificially

21   inflated price of its stock.  As demonstrated by their overstatements and misstatements of the

22   Company's financial condition and performance throughout the Class Period, the Individual

23   Defendants, if they did not have actual knowledge of the misrepresentations and omissions

24   alleged, were severely reckless in failing to obtain such knowledge by deliberately refraining

25   from taking those steps necessary to discover whether those statements were false or misleading.

26

27

28

72.     As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Spectrum securities was artificially inflated during the Class Period.  In ignorance of the fact that the market price of Spectrum shares was artificially inflated, and relying directly or indirectly on the false and misleading statements made by the Defendants, upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by the Defendants but not disclosed in public statements by these Defendants during the Class Period, Plaintiff and the other members of the Class acquired Spectrum securities during the Class Period at artificially inflated high prices and were damaged thereby.

73.     At the time of said misrepresentations and omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiff and the other members of the Class and the marketplace known of the true performance, business practices, future prospects and intrinsic value of Spectrum, which were not disclosed by the Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired Spectrum securities during the Class Period, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

74.     By virtue of the foregoing, Spectrum and Individual Defendants each violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

75.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

**COUNT II**
**For Violations of §20(a) of the Exchange Act**
**Against the Individual Defendants**

76.     Plaintiff repeats and realleges the allegations set forth above paragraphs as if set forth fully herein.  This claim is asserted against the Individual Defendants.

77.     The Individual Defendants were and acted as controlling person of Spectrum within the meaning of §20(a) of the Exchange Act as alleged herein.  By virtue of their high level positions with the Company, participation in and/or awareness of the Company's operations and/or intimate knowledge of the Company's actual performance, Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.  Each of the Individual Defendants was provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

78.     In addition, each of the Individual Defendants had direct involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

79.     As set forth above, Spectrum and the Individual Defendants each violated §10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their controlling position, Individual Defendants are liable pursuant to §20(a) of the Exchange Act.  As a direct and proximate result of these Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## XII. <u>REQUEST FOR RELIEF</u>

WHEREFORE, Plaintiff, on behalf of himself and the Class, pray for judgment as follows:

a) Determining that this action is a proper class action, designating Plaintiff as Lead Plaintiff and certifying Plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Lead Counsel;

b) Awarding Plaintiff and the other members of the Class damages in an amount which may be proven at trial, together with interest thereon;

c) Awarding Plaintiff and the members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' and experts' witness fees and other costs; and

d) Awarding such other relief as this Court deems appropriate.

## XIII. <u>JURY DEMAND</u>

Plaintiff demands a trial by jury.

Dated: April 10, 2013

Respectfully submitted,

*/s/ Dan C. Bowen*
**BOWEN HALL**
Dan C. Bowen, Esq.
dbowen@bowenhall.com
Nevada Bar No. 1555
555 South Center Street
Reno, Nevada 89501
Tel: (775) 323-8678
Fax: (775) 786-6631

**SAXENA WHITE P.A.**
Joseph E. White III
Lester R. Hooker
2424 North Federal Highway,
Suite 257
Boca Raton, FL 33431
Tel: (561) 394-3399
Fax: (561) 394-3082

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**RYAN & MANISKAS, LLP**
Katharine M. Ryan
Richard A. Maniskas
995 Old Eagle School Rd., Ste. 311
Wayne, PA 19087
Tel:  (484) 588-5516
Fax:  (484) 450-2582

**CERTIFICATION**

I, William P. Skene , ("Plaintiff") declare, as to the claims asserted under the federal securities laws that

1.      Plaintiff has reviewed the complaint and authorizes its filing.

2.      Plaintiff did not purchase the security that is the subject of this action at the direction of Plaintiff's counsel or in order to participate in any private action.

3.      Plaintiff is willing to serve as a representative party on behalf of the class, either individually or as part of a group, including providing testimony at deposition or trial, if necessary. I understand that is not a claim form, and that my ability to share in any recovery as a member of the class is not dependent upon execution of this Plaintiff Certification.

4.      Plaintiff's purchase and sale transaction(s) in the **Spectrum Pharmaceuticals, Inc. (NASDAQ: SPPI)** security that is the subject of this action during the Class Period is/are as follows:

PURCHASERS

| Buy Date | Shares | Price per Share |
|----------|--------|-----------------|
| 8/30/12 | 128 | $12.01 |
| | | |
| | | |
| | | |
| | | |

SALES

| Sell Date | Shares | Price per Share |
|-----------|--------|-----------------|
| | | |
| | | |
| | | |
| | | |
| | | |

**(Please list additional purchase and sale information on a separate sheet of paper, if necessary)**

5.      Plaintiff has complete authority to bring a suit to recover for investment losses on behalf of purchasers of the subject securities described herein (including Plaintiff, any co-owners, any corporations or other entities, and/or any beneficial owners).

6.      During the three years prior to the date of this Certification, Plaintiff has not sought to serve or served as a representative party for a class in an action filed under the federal securities laws, except as described below_____.

7.      Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 4th day of April , 2013.

_____
Signature

William P. Skene
_____
Print Name